5 So.2d 304

**STATE v. BRIWA et al.**

No. 36241.

Nov. 3, 1941.

Rehearing Denied Dec. 1, 1941.

Clarence Dowling, of New Orleans, for relators.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Asst. Atty. Gen., and J. Bernard Cocke, Dist. Atty., and Guy Johnson, Asst. Dist. Atty., both of New Orleans, for respondent.

HIGGINS, Justice.

George Briwa, James H. Morrison, Allen Dunnington and R. M. Singletary were charged in an indictment filed on March 14, 1941, with criminal libel of W. Prescott Foster on March 8, 1941, "by making, writing, publishing and causing to be published, a certain false, scandalous and malicious libel of and concerning the said W. Prescott Foster," which libel was alleged to have appeared in a newspaper publication designated as "The Farmers' Friend," the "official organ of the Louisiana Farmers' Protective Union, Incorporated."

The defendants filed a plea to the territorial jurisdiction of the Criminal District Court for the Parish of Orleans on the ground that "The Farmers' Friend" was published in the City of Hammond, Parish of Tangipahoa, Louisiana, and, therefore, if any offense had been committed, it took place in Tangipahoa Parish and not in the City of New Orleans.

After a hearing, in open court, on the plea to the jurisdiction, the district judge overruled it, and the defendants, as relators, then applied to this Court for writs of certiorari and prohibition.

We issued a writ of certiorari, returnable on October 10, 1941, and the case is now before us for review.

The question of jurisdiction involved here has no bearing whatever on the guilt or innocence of the accused.

The relevant part of Section IX, Article I of the Constitution of the State of Louisiana of 1921, reads:

"* * * provided further, that all trials shall take place in the parish in which the offense was committed, unless the venue be changed; provided further, that the Legislature may provide for the venue and prosecution of offenses committed within one hundred feet of the boundary line of a parish. * * *"

In the case of State v. Nugent, 191 La. 198, at page 200, 184 So. 746, at page 747, this Court said:

"Under the provisions of Section 9 of the Bill of Rights of the Constitution of 1921 a person accused of a crime has the right to have a plea to the territorial jurisdiction of the trial court passed on by the trial judge before being put on trial for the alleged offense. This provision of the Constitution not only guarantees the defendant that he shall not be convicted in any other parish than that in which the offense was committed but guarantees that he shall not be tried in any other parish. This identical question was decided in the case of State v. Hogan, 157 La. 287, 102 So. 403, wherein this Court, after reviewing all the prior decisions on this subject matter, concluded that the defendant is as a matter of right entitled *to have his plea to the territorial jurisdiction of the court decided before being placed on trial for the offense.*" (Italics ours.)

In the case of State v. Moore et al., 140 La. 281, 72 So. 965, 971, the editor of the Times-Picayune and one of its reporters were indicted for libelling Clarence Pierson, in East Feliciana Parish, because of publications appearing in that newspaper's issues of February 13th, 14th, 15th and 16th (1916). Pleas to the territorial jurisdiction of the court were filed on the ground that the Times-Picayune Publishing Company, the corporation owning the newspaper, had its domicile in the City of New Orleans and that its editor and manager and its reporter also resided there; that the paper was printed and published or issued in the City of New Orleans and that if a libel had been committed, the offense took place only in the City of New Orleans; that under the law there could be only one offense and that the accused, under the Constitution, was entitled to be tried only in the parish where the alleged · libel was committed. The trial court overruled the plea to the jurisdiction and the accused applied to this Court for writs. In sustaining the jurisdictional plea and annulling the judgment of the lower court overruling it, this Court stated:

"* * * The language of article 9 of the Constitution leaves no doubt that the allegation in an indictment that the alleged offense was committed in the parish in which the indictment is presented is not to be presumed to be true, for the purposes of the trial of a plea to the jurisdiction, or until the jury or judge decides otherwise on the trial of the person accused. The constitutional requirement is not that all trials shall take place in the parish in which the offense is alleged to have been committed. If that were the constitutional requirement, the allegation in the indictment that the alleged offense was committed in a certain parish would be sufficient to vest the court having criminal jurisdiction in that parish with jurisdiction of the offense charged, and a plea to the jurisdiction would be treated as an exception of no cause of action is in a civil case. But the constitutional guaranty is 'that all trials shall take place in the parish in which the offense was committed.' In the case last cited (State v. Montgomery [115 La. 155, 38 So. 949]), it was alleged in the indictment that the offense was committed within the parish of Franklin, within 100 yards of the boundary line of that parish. The right of the defendants to require that allegation to be proven before they were put on trial, in order to preserve their constitutional right not to be tried in any other parish than that in which the offense was committed, was not doubted by this court.

\* \* \*

"The 'publication,' in the case cited, was the selling of the newspaper by Staub, the plaintiff in the main suit and defendant in reconvention; and it was properly held that each sale or delivery of the newspaper, containing the libelous article was a distinct offense. It is not contended in the case before us that the defendant Daniel D. Moore published the alleged libelous article in the sense in which the word is used· in the case cited; i. e., by delivering, exhibiting, or exposing a copy of the paper in the parish of East Feliciana. On the contrary, it is admitted that the only publishing done by the

defendant Moore was the publishing of the Times-Picayune containing the alleged libelous articles, in the sense in which the word 'publish' is used in newspaper parlance. The case cited, therefore, has little or no application to the facts of the case before us.

"The defendants also quote from page 5844, vol. 6, of Words and Phrases [First Series], citing Giles v. State, 6 Ga. 276, viz.:

"'"Publication," as the word is used in reference to the publication of a libel, is nothing more than doing the last act of the accomplishment intended by it. The moment a man delivers a libel from his hands, his control over it is gone. He has shot his arrow, and it does not depend upon him whether it hits the mark or not. There is an end of the locus pœnitentiæ; his offense is complete; all that depends upon him is consummated; and, from that moment, upon every principle of common sense, he is liable to be called upon to answer for his act.'

"The quotation is appropriate only to the question whether the defendant in this case was guilty of the crime of libel by publishing the newspaper containing the article supposed to be libelous, in the city of New Orleans. If he committed the offense by publishing the newspaper in New Orleans, and if, as the author quoted says, there was an end of the locus pœnitentiæ then, and his offense was completed, and all that depended upon him was consummated, it cannot be said that what was done by Daniel D. Moore, constituting a complete offense in the city of New Orleans, was committed in the parish of East Feliciana.

\* \* \*

"The publishing that is alleged to have been done by the defendant Moore, according to the facts on which this case is submitted, was the publishing of the Times-Picayune in the city of New Orleans. It is admitted that the publishing in that sense was not done by the defendant in the parish of East Feliciana. The legal question presented is whether the publishing of the newspaper containing the alleged libelous article in the city of New Orleans, taken in connection with the fact that the newspaper had a circulation in the parish of East Feliciana, constituted a publication, in the technical sense in which publication might amount to the commission of a libel in the parish of East Feliciana.

\* \* \*

"We cannot ignore the fact that there is a constitutional restriction in this state, prohibiting the trial of a criminal case in any other parish than that in which the offense was committed. Hence we come back to the question of law, presented by the facts of the case before us, whether what was done by the defendant Moore, in the city of New Orleans was the commission of the crime of libel in the parish of East Feliciana.

\* \* \*

"The learned district attorney says in his brief that a verdict of the Twenty-Fourth judicial district court in and for the parish of East Feliciana, on the bills of indictment or information in this case, would free the defendants from prosecution on the same

libelous matter in any other jurisdiction or in any other court of this state. That admission is an acknowledgment of the correctness of the proposition that only one offense was committed, if the article complained of was libelous, by the publication of the article in the Times-Picayune, no matter how many parishes or jurisdictions the paper circulated in. If what Daniel D. Moore did was a complete offense, and constituted only one offense, it was certainly committed in the city of New Orleans. If the fact that a bundle of copies of the Times-Picayune, containing the alleged libelous article, was sent to the parish of East Feliciana conferred jurisdiction upon the district court of that parish to try the alleged offender for what he did in the city of New Orleans, it must be upon the theory that the sending of that bundle of papers to the parish of East Feliciana constituted an offense in that parish. If that be true, the sending of another bundle of the newspapers to the parish of Rapides constituted another offense in that parish, and the sending of another bundle of the newspapers to the parish of Plaquemine constituted another distinct offense there; and, on the same principle, the sending of each newspaper to each individual subscriber or purchaser was a distinct offense. It would lead to the anomalous proposition that as many distinct offenses were committed in as many different jurisdictions, by what Daniel D. Moore did in the city of New Orleans, as there were copies of the newspaper containing the alleged libelous article; that what Daniel D. Moore did in the city of New Orleans was multiplied into as many thousands of offenses on his part as there were subscribers and

purchasers and readers of that issue of the Times-Picayune. To say that a prosecution and conviction by a court having jurisdiction in any parish where one of the newspapers found its way would protect the defendant from prosecution in any other parish does not answer the constitutional requirement that he shall be tried for what he did in the parish where the offense was committed, and in no other parish. That constitutional guaranty is worth very little indeed to the defendant, if the district court in every parish in the state has jurisdiction to try him for what he did in the city of New Orleans, even though the final judgment of any one of the courts would abate the prosecution in all the others. To recognize such an ubiquitous jurisdiction for the trial of what is virtually conceded to be only one offense, for which the defendant's liberty can be put in jeopardy only once, would let the technicalities hide the substance of the law and take the place of common sense. Our conclusion is that the relator is entitled to the relief prayed for."

In the case of State v. Cuniffe et al., No. 32,099 of the Docket of this Court, the relator was denied its request for a writ of certiorari to review the judgment of the district court, which held that in a prosecution, growing out of a newspaper libel, against the editor and others domiciled in New Orleans, the court was without territorial jurisdiction, because while it appeared that the newspaper was distributed and circularized in New Orleans, it had been published in Meridian, Mississippi. This Court, in refusing to grant the relator relief, stated: "On the facts shown the ruling com-

plained of is sustained by the doctrine of State v. Moore, 140 La. 281 [72 So. 965], and the authorities therein cited. Writs refused."

In the above case, the charter of the Louisiana Progress was passed before a Notary Public for the Parish of Orleans, City of New Orleans, Louisiana, where the corporation was domiciled. The Progress was unable to have the newspaper printed in Louisiana and succeeded in having it printed in Meridian, Mississippi, by the Meridian Star. The articles were written in New Orleans and Baton Rouge and the newspaper was designed and intended for circulation and distribution not in Mississippi but in Louisiana and particularly in New Orleans, where the Progress had its principal office. On the masthead of the paper the publication offices were stated to be located in New Orleans, La. and Meridian, Miss. The defendants resided in New Orleans, but the paper was entered as second-class mail in the post office at Meridian, Miss., from where it was mailed to its subscribers throughout Louisiana. After considering the above facts, Honorable Frank T. Echezabal, Judge of Section "D" of the Criminal District Court of the Parish of Orleans, held that the issuance or publication of a libelous statement is the completion of the offense and that, therefore, the territorial jurisdiction of the court lies at the place where the libel is issued or published, and, in his written opinion, stated:

"The evidence showed that the defendants published the Louisiana Progress in Meridian, Mississippi. That the Louisiana

Progress is a newspaper is admitted by the State in its information.

"The term 'publish' as applied to a newspaper has a restricted and technical signification. It means to print and issue, that is, to print and send forth into the usual channels of circulation and distribution. State v. Moore et al., 140 La. 281 [72 So. 965]. From this case we quote the following:

"'The Supreme Court of the United States, through Chief Justice White, in the recent case of the United States v. Press Publishing Co., 219 U.S. 1, 31 S.Ct. 212, 55 L.Ed. 65, 21 Ann.Cas. 942, held that the circulation of a newspaper in a jurisdiction other than that in which the newspaper was printed and published did not constitute on the part of the publisher a distinct and separate crime of libel within the jurisdiction in which the newspaper was circulated, separate and distinct from the offense committed by the publisher of the newspaper in the jurisdiction in which the paper was printed and issued, because of a libelous article published therein.'

"The evidence shows that the alleged libelous article was contained in a copy of The Louisiana Progress printed in and issued from Meridian, Mississippi, and, therefore, beyond the jurisdiction of the court, and the power of the State of Louisiana to prosecute. If guilty of libel, the venue of the defendants' offense is in Lauderdale County, State of Mississippi."

This conclusion is in accord with the jurisprudence in civil cases—that a newspaper is published at the place where it is

entered in the post office, and where it is first put into circulation, and not at the place where it is printed. Bardwell et al. v. Town of Clinton, et al., La.App., 180 So. 148; Addison et al. v. Town of Amite City et al., La.App., 161 So. 364. See, also, Ruling Case Law, Vol. 20, pg. 207, under title "Newspaper," at Section 7; Corpus Juris, Vol. 46, pg. 26, No. 20B; Drainage District No. 9 of Miller County v. Merchants' & Planters' Bank, 176 Ark. 474, 2 S.W.2d 1079, 1082.

In the instant case, the District Attorney, in his brief, concedes that in State v. Moore et al., supra, the Court held that it was incumbent upon the State not only "to allege" but also "to prove" that the offense was committed within the territorial jurisdiction of the court where the bill of information or indictment under which the accused was charged, was filed, and that the burden of proof was upon the prosecution, but argues that the evidence introduced by the State was sufficient to discharge it.

The defendants, on the other hand, contend that the testimony and the evidence introduced by the prosecution merely show that the alleged libelous newspaper was printed in the City of New Orleans (a fact which they concede), but deny that any proof whatsoever was introduced tending to show that the newspaper was published in the City of New Orleans and, on the contrary, state that the evidence shows that the newspaper was published or issued at its domicile in Hammond, Tangipahoa Parish, Louisiana.

The defendants were granted a bill of particulars and the District Attorney then

alleged that the defendant George Briwa received and set up, or caused to be received and set up, the type and print for the publication of the libelous statements included in the indictment; that James H. Morrison was the attorney for the Louisiana Farmers' Protective Union, Inc.; that The Farmers' Friend was the official organ of the Louisiana Farmers' Protective Union, Inc.; that Allen Dunnington was the business manager of the Louisiana Farmers' Protective Union, Inc.; and that R. M. Singletary was the President of the Louisiana Farmers' Protective Union, Inc.

Captain John J. Appel of the State Police testified that he was furnished a copy of the March issue of the newspaper in question by the District Attorney's office; that on March 12, 1941, he went to the office of the Victory Printing Company at No. 533 Carondelet Street, New Orleans, where the newspaper was printed; that he found printing presses and machines located there; that he interviewed George Briwa, the manager of the Victory Printing Company; that his conversation with George Briwa was taken down, in shorthand, by two young lady stenographers from the District Attorney's office; that he did not find any copies of the issue of the newspaper containing the alleged libel but did find an issue of The Farmers' Friend dated March 15, 1941, bearing the headline "Berry Fete Parade, March 28," in the printing presses; and that he did not trace the delivery of any packages of newspapers from the Victory Printing Company's place of business, but that other officers of the State Police did so. (These officers did not testify in the case.)

The two stenographers who wrote down in shorthand and typed the statement of Briwa, which was introduced in evidence, identified the transcript as a true and correct reproduction of their notes.

Briwa's statement to Captain Appel and Officer Parker of the State Police substantially shows that the domicile of the Louisiana Farmers' Protective Union, Incorporated, is at Hammond, Tangipahoa Parish, Louisiana; that the Victory Printing Company is a separate corporation engaged in commercial job printing, with its domicile at New Orleans; that in February, 1938, Scott Wilson made arrangements with the Victory Printing Company to print the newspaper; that the original copy of the newspaper was composed at Hammond and was sent by messenger to the printing company's office and later corrected and proof read there or elsewhere by representatives of the newspaper; that the Victory Printing Company did the printing and the Quality Linotype Company, a separate corporation, which occupied a part of the same building with the printing company, set some of the type, and the balance was set by hand by the employees of the Victory Printing Company; that the Victory Printing Company in no way issued, distributed or circularized the newspapers in the City of New Orleans; that the cuts, the original manuscripts and original copies of the newspapers, together with the newspapers, after they were printed, were returned to The Farmers' Friend or the Louisiana Farmers' Protective Union, Incorporated, at Hammond; that, as the newspapers were printed, they were placed in bundles of approximately 500 each and covered with paper and tied on both ends with rope making it impossible for anyone to read them; that the bundles were placed on small handtrucks in the Victory Printing Company's place of business, and on the day the papers were ready, the representatives or employees of The Farmers' Friend or the Louisiana Farmers' Protective Union, Incorporated, called with a truck and took the bundles of newspapers away; that the bills for the printing were sent to Hammond and paid by the checks of the Louisiana Farmers' Protective Union, Incorporated; that R. M. Singletary was the President and Allen Dunnington, the Business Manager of the Louisiana Farmers' Protective Union, Incorporated, and Kenny Demar was the Circulation Manager of the Farmers' Friend; and that Preston Delcazal, James H. (Jimmie) Morrison and J. H. (Joe) Sims came to the office of the Victory Printing Company in connection with the printing of The Farmers' Friend.

Charles F. Schultz testified that he was a resident of the City of New Orleans and the foreman and secretary-treasurer of the Victory Printing Company since its beginning; that the Quality Linotype Company, a separate corporation, occupying a portion of the same building with the printing company, set some of the type and that he, personally, set by hand other type for the printing of The Farmers' Friend; that he had set type for the printing of the issue of The Farmers' Friend in question; that he received the original copy from Briwa and furnished him with the first proof and then arranged the material, after it was corrected, into pages, for the printing of

the newspaper; that after the newspapers were printed they were packed in bundles of about 500 each, wrapped in paper and tied with rope; that it was impossible for any one to read the newspapers; that the bundles were then picked up by the agents who drove the truck for The Farmers' Friend; that the original copies and all of the cuts for the newspapers were returned with the newspapers, as they were printed, to The Farmers' Friend at Hammond, Louisiana; that his company did not distribute or circularize the papers; that it did commercial job printing; that there was a change made in the printing of the headlines from the alleged libelous statement against W. Prescott Foster to "Berry Fete Parade, March 28," and that this issue of the newspaper was being printed on March 12, 1941, when the State Police called at the printing office; and that he did not remember the particular date when the alleged libelous issue was completed, nor could he recall whether it was on a Friday or Saturday, or on March 7th or 8th, but that it was about one week before the Grand Jury meeting which returned the indictment on March 14, 1941.

Frank P. Rippo, a resident of New Orleans, testified that he was the treasurer of the Quality Linotype Company, a separate and distinct company from the Victory Printing Company; that his company did linotype work for the Victory Printing Company in connection with the printing of the newspaper known as The Farmers' Friend; that he received the copy from Briwa and that some of the type of the March issue of The Farmers' Friend ap-

peared to be the same as that used by his company; that he did not know where Briwa secured the original copy of the newspaper; and that his company did not circularize or distribute the newspapers.

Campbell Palfrey, a resident of the City of New Orleans, testified that he went into a lunch room in the Commercial Alley, at Camp Street, about 9:30 a. m., and that "* * * to the best of my recollection it was * * *" Saturday morning, March 8th, and while standing there beside a man, he read the alleged libelous article in The Farmers' Friend concerning W. Prescott Foster; that he did not inquire where the man had gotten the newspaper; and that he did not know whether that copy of The Farmers' Friend had been brought to New Orleans from Hammond.

Charles Mooty, a resident of New Orleans, testified that he was a newspaper vendor at the corner of Gravier and St. Charles Street, New Orleans; that he sold a number of copies of the March issue of The Farmers' Friend, which headlined the alleged libelous statement against W. Prescott Foster; that it was approximately one week after he received five or six bundles of this issue of the newspaper, which had been thrown from a truck to him, that the indictment was returned against the accused; that he did not know the man or men who delivered the bundles of newspapers and that sometimes they were delivered in a Ford car and other times in a truck; that he could not testify that any of the accused were the ones who delivered the papers in the truck or the Ford automobile and that different men

delivered the bundles of papers from time to time; and that he did not pay any purchase price for the papers and sold them for 5¢ a copy and permitted some of the newsboys to sell them to make extra money.

Octave Boudreaux testified that he was employed by the Teche Greyhound Lines as an express agent in New Orleans, and that on or about March 21, 1941, he received a package consigned to Walter Stevens, Franklin, Louisiana, and that the package exhibited to him was the one he received, although he did not know what it contained.

Walter Stevens testified that he worked for the Southern Pacific Railway Company; that he requested Johnnie Velcich, a friend, to send him a copy of the newspaper in which W. Prescott Foster was said to have been libeled, and that, instead of sending him one copy, Velcich sent him several copies in the package which was delivered by the Teche Greyhound Lines at Franklin, La.

The District Attorney then introduced in evidence a copy of the March issue of The Farmers' Friend, Hammond, La., containing the alleged libelous statement, as a part of the State's case, as well as a copy of the same newspaper dated March 15, 1941, bearing the headline "Berry Fete Parade, March 28th."

J. A. Sims, a defense witness, testified that he was an attorney-at-law and a resident of Hammond, La.; that he and James (Jimmie) H. Morrison were law partners with offices at Hammond where they resided; that they were the attorneys for the Louisiana Farmers' Protective Union, Incorporated, of which The Farmers' Friend newspaper was the official organ; that the corporation was domiciled at Hammond, Tangipahoa Parish, La.; that Allen Dunnington, its business manager, resided in the Seventh Ward of Hammond; that R. M. Singletary, its President, resided in Ascension Parish; that James (Jimmie) H. Morrison resided at Hammond; that all of these parties were in Hammond on March 8, 1941, the date that the alleged offense of libel was said to have been committed; that they did not personally issue, distribute or circularize any issues of the newspapers in the City of New Orleans, because, throughout that day and until late that night, they were attending several farmers' meetings in the strawberry belt; that the Louisiana Farmers' Protective Union, Inc., secured from the Post Office Department of the United States Government the right to enter the publication known as The Farmers' Friend, as second-class mail at Hammond, from where it was issued and mailed to its subscribers and otherwise distributed and circularized; and that the newspapers were printed in the City of New Orleans because there was not a printing press in Hammond large enough to print them.

This witness identified certified copies of the charter and the certificate of incorporation of the Secretary of State, showing that the Louisiana Farmers' Protective Union, Inc., was domiciled at Hammond, as well as copies of letters from the United States Post Office Department stating that the Louisiana Farmers' Protective

Union, Inc., had secured the right to enter The Farmers' Friend as second-class mail, first, at Pontchatoula and, subsequently, at Hammond, in order to obtain a lower postage rate.

A copy of the newspaper was also introduced in evidence showing the masthead declaration that the newspaper was published at Hammond, La., the agreed place of publication between the Louisiana Farmers' Protective Union, Inc., and the United States Postal authorities, who granted a mailing permit to the publishers at Hammond, La.

The trial judge, in reaching the conclusion that the newspaper had been published in New Orleans because it had been circularized and distributed there, said: " * * * The reasonable theory consistent with all the circumstantial facts is that the bundles which were delivered to the distributing agent Mooty in New Orleans at Mooty's street corner, were the same bundles that were made up in the printing shop, and they were delivered directly from the printing shop in New Orleans and not brought first to Hammond and then back again to New Orleans for delivery at the street corner."

The State made no effort to prove that copies of the issue of The Farmers' Friend in question were distributed or circularized in New Orleans prior to the time that they were mailed or otherwise circularized or distributed at Hammond. Although J. A. Sims, one of the Attorneys for the Louisiana Farmers' Protective Union, Inc., testified in the case, the District Attorney

elected not to ask any questions on cross-examination as to whether or not The Farmers' Friend was mailed or distributed or circularized at Hammond, before it was circularized or distributed in the City of New Orleans. Captain John J. Appel of the State Police testified that the officers of the State Police, under his supervision, traced deliveries of the newspapers in question, but, as we have already stated, they did not testify.

The defendants offered testimony to show that they were not in New Orleans on the day that the alleged libelous matter was distributed or circularized in New Orleans, but that they were in Hammond, Louisiana, the domicile of the corporation; and that they did not distribute or circularize the newspaper in New Orleans, La.

The trial judge states that it would be "unreasonable to assume" that the newspapers were first taken to Hammond and then subsequently brought back to New Orleans. Mooty, as a State witness, testified that he paid nothing for the papers and, therefore, it also would be unreasonable to say that the Louisiana Farmers' Protective Union, Inc., delivered papers to be circularized and distributed through a New Orleans newspaper vendor, who paid nothing for them, before the regular paying subscribers had received their copies out of Hammond. There was no proof that the truck which took the newspapers to Hammond did not arrive at its destination before the truck or Ford automobile delivered the papers to Mooty, or that the papers were not mailed and otherwise distributed from Hammond be-

fore being circularized in New Orleans. The law is clear that the State has the burden of proving that the newspaper was published in the City of New Orleans. Merely showing circulation or distribution of copies of the newspapers in New Orleans is not sufficient to establish proof of publication, i. e., that the newspapers were first issued or placed in circulation or distributed in New Orleans before being mailed and distributed to regular subscribers from the domicile of the corporation at Hammond.

■ If the State must not only allege but also prove where the offense was committed, in order to meet the constitutional jurisdictional requirements, then, it is obvious that the trial judge had no right, in the absence of proof, "to assume" that the offense was committed within the court's jurisdiction.

It is our opinion that the prosecution failed to establish that the alleged libelous issue of the newspaper was issued or published in the City of New Orleans within the meaning and contemplation of the law and, therefore, did not prove that the alleged offense was committed in New Orleans or within the territorial jurisdiction of the Criminal District Court for the Parish of Orleans.

For the reasons assigned, it is ordered that a peremptory writ of prohibition issue herein, directed to Hon. William J. O'Hara, Judge of Section "A" of the Criminal District Court for the Parish of Orleans, prohibiting further proceedings in the prosecution complained of, and that the defendants, George Briwa, James H. Morrison, Allen Dunnington and R. M. Singletary be discharged.